Next case, United States v. Quashie. Okay. Thank you. Good morning, Your Honors. My name is Peter Tomeo. I represent Mr. Quashie, the appellant defendant in this case. Your Honor, this case presents, invites the Court to return back to looking at the admission of other act evidence. And in this case, that suggestion that Mr. Quashie was a member of a robbery ring that extended over 10 years, while the evidence, I'm sorry, while the charged, charges in the indictment only deal with a much shorter period, six, six months. The evidence, Your Honor, of these other acts comes from a single source. Essentially, it comes from the cooperating witness who is, was free to make up and to suggest that Mr. Quashie had been involved in a number of instances, all conveniently against people who would not have reported it to the police, drug dealers, brothels, etc. But how would you have had the government put those witnesses on the stand and testify without eliciting the fact of their prior involvement with the defendant? For two reasons. One is it tells the complete story of their relationship. It tells why they would turn to Mr. Quashie in this instance. And it also explains why they didn't need to meet and go over their plans for what was a fairly complicated scheme because they'd done it before. But the evidence didn't show that. There wasn't one single prior act that dealt with a robbery similar to the mermaid's robbery, referring to the second robbery of which he was convicted. He was acquitted of the earlier one involving Parvis. The second one was a robbery in which the, Mr. Paccio, his co-conspirators... The acquitted conduct is not irrelevant. He was tried for it. So the judge's determination of what conduct is admissible was based on the charge conduct, which included both robberies. And I think there was indisputably prior conduct other acts evidence that was quite similar in modus operandi to the, to the robbery of which he was acquitted, no? But not in a way of showing some sort of an idiosyncrasy, which is usually what we're looking for in modus operandi. What was unusual about this? All that we have in the testimony of Mr. Paccio about those police officer impersonations is they had badges. That is not a unique nature of a crime. There is a whole... We learned from this case that the NYPD has a whole unit that just specializes in police impersonation crimes. This is an all that Mr. Paccio says is they had badges. He doesn't say anything more than that. And yet he goes over and over and over this again. And also he brings up a robbery which had no, none of these connections. This is the El Mundo robbery, one which the judge definitely should have kept out because in that case, the end of an individual was killed. A victim was killed by Mr. Paccio. The, the, the court kept some of it out, but Mr. Paccio brought out that there was somebody killed in that. Your client's phone was found in the apartment of, of one of the robberies? Yes, of the robbery for which he was acquitted. Pretty, well, still pretty compelling evidence that he was there, right? Well no, because in this case, respectfully, Your Honor, we have an unusual situation. This is not, I mean, for parents of teenagers, we know they keep their phones tight, but this is a group that shared phones. That was undisputed testimony in this case that they all used each other's phones, particularly Mr. Paccio. His story is he lent his phone to someone and then that person engaged in a robbery, committed a robbery, and, and then inadvertently dropped the phone in the apartment, which was then discovered later? That same, that same day. But Your Honor, that is what happened, and it's, and we know, and the jury accepted that. The jury acquitted him of that count. If the jury was going to find if, that he was guilty of that, they had that evidence, and I'd be in a very different position in, in this argument. This other act evidence did not come in to show part of the conspiracy. The conspiracy was narrow. It was cabinded by the two robberies that were charged in the substantive acts. The most— Was it not relevant to show the relationship among the alleged co-conspirators, the modus operandi? But again, Your Honor, respectfully, the modus operandi was very limited. It was on the, there was one event which was a post-conspiracy event in which they were supposed to have acted as cable repairmen. All the other acts were prior to that, except for one, and those had to deal with just having police badges, hardly unique. And they don't go, and the judge also admitted it on the basis of identity, yet it doesn't show identity because it's all based on the testimony of the same individual. And even if it's relevant, Your Honor, the trial court had the responsibility for applying 443, that's right, 403, the, and doing, and testing the probative value against the risk of unfair prejudice. He obviously, he obviously did that to the extent that he kept certain things out, and he, you know, told the government that it had to keep its evidence on this issue to a minimum, which I think the government did. I think it covers only 13 or 14 pages in the transcript. Not to mention, I think he reserved judgment on that to trial, and did you object on that grounds at trial? It wasn't trial counsel, Your Honor. It was, I don't think there was a contemporaneous objection at the time because the government did limit itself to what the court said it would, it would admit. If they had gone beyond that, I think trial counsel would have made a consideration. Right. So, in other words, the judge did make a balancing and charged the government with it, and the government did keep it to a minimum, and there was no objection to what it presented. So how was there a valid 403 argument, and how have you not waived it or at least made it subject to a plain error review? Well, no. He, respectfully, Your Honor, the trial counsel did object on the 403 ruling at the time it was entered prior to trial that this, that this amount of testimony would come in. It was a very, it was limited to a litany of these events, and it all came in through the testimony of Paccio, except for one event where, where Acola backed him up. And you have to consider against that, Your Honor, the paucity of evidence that Mr. Quashie participated in the crime in which he was convicted. No one identified him. The victim identified the third robber as a tall, black man with dreadlocks and who was clean shaven, and yet even the testimony of Paccio was that Mr. Quashie did not have dreadlocks. He had short hair, and that he had a mustache at the time. Against that, Your Honor, we indicate that the, we argue that the evidence probative value was far outweighed by the risk of prejudice. Thank you, Your Honor. I, uh, Thank you. We'll hear from the court. Obviously, we serve on all the other issues I raise in the brief. Yes. Thank you, Your Honor. May it please the Court, my name is Eric Paulson, and I represent the defense counsel did not, um, or appellant did not address. Um, in his papers, he mentions that the court improperly admitted evidence of a conspiracy that extended too far backwards. Um, he spends a lot of time in his brief on this issue. I want to make clear that the, what the district court did in this case, it admitted the evidence under two theories, both under 404B and, uh, a limited subsection of that evidence as evidence, direct evidence of this conspiracy. Um, there was overlap in some of that evidence. When it came to the charging decision, however, the court, um, dealt with everything as 404B. It gave a limiting instruction for all of that evidence. It said that all of that evidence could only be used for the limited purposes of 404B. And so, although the district court gave a, uh, multiple rationales for that evidence coming in, it did give a restrictive conservative instruction when it came to trial. And I think there's been no allegation that the government used, uh, that evidence as direct evidence. Um, I think, Your Honor, in reviewing the, the papers here, we'll see that the, um, both parties, um, focused on the evidence of the two crimes and used the 404B evidence for the reason that it should be there to explain the, the odd qualities of this case. Um, Your Honor has brought up some of these, the fact that there was, uh, this robbery was done with very little preparation. It was done with very little planning, despite the fact that it was a push in robbery that involved victims, hostages. Um, that evidence was also useful to explain why, um, as Judge Chin mentions, after the defendant dropped his phone during the first robbery, he wasn't radioactive for the next robbery. Um, needless to say, this was a significant mistake. His DNA was on the phone. It was his telephone. The 404B evidence showed that they had done robberies like this over many, many years. This was the first incident like this that would, you know, cause, uh, distress among his co-conspirators. And as a result, um, I think it was viewed as aberrational behavior and they were willing to use him again at the next robbery when they needed his cable equipment. Or maybe they had to make amends because they borrowed his phone and left it at the scene of a robbery that he didn't participate in. It's an odd way to make amends, Your Honor. And I will add on, on that particular robbery, the one where he dropped his phone, his explanation for not calling the phone to find out where it was is that he didn't know his phone number. Um, there was a, a couple of things that were just mentioned. I'd just like to clarify the record. Um, what's the basis for admitting the post robbery, um, similar acts evidence? I think there was evidence of a robbery that allegedly took place after the two charged robberies. Yes, Your Honor. There was one. Um, the, the reason that was entered in is that was a robbery which, um, had again a similar MO, um, where they used a, um, some police gear, but significantly they also brought in this individual Charles Sumter, uh, who was a very large individual who, um, played a, a secondary role in the, the robbery that was the defendant was convicted of. Um, part of the reason we wanted the, the 404B evidence in was to explain again, this unusual circumstance that in each robbery, they brought in a fourth co-conspirator in at the last minute with no discussion among anyone. This is a, this is again a kind of an odd behavior for people I think would expect a robbery of this sort to be very much planned. And so that particular robbery again displayed that, that characteristic that Charles Sumter came in at the last minute, they again used police gear and it showed that the, the manner in which they had committed these crimes. Okay. Um, and just a couple of issues, um, uh, uh, Pellon had mentioned that there was only a single source for the 404B. Uh, that's true for part of the 404B. Um, the, the 404B that was, um, more closely, uh, in time to the charge robberies, um, in some cases was corroborated by the second co-operator, uh, Diego Ercole, who testified about the same things. Um, he mentioned that at El Mundo robbery, uh, where a murder had taken place had been referenced, uh, there was actually two El Mundo robberies. Uh, the murder happened in 2012. The robbery happened in 2009. Um, uh, Mr. Pacheco murdered somebody in 2012 at that place. The, the robber he talked about was the 2009 robbery though. These are two different robberies at the same place. Um, was there any objection to the reference to the murder? There was, yes, because the, um, uh, the, the co-operator, Mr. Pacheco, uh, his testimony is that, um, well, he beat the man to death with his bare hands. Um, but he had a taser, which he also used to shock the victim. The taser he borrowed from the defendant. Um, the government had asked to put that in. That was one of the things that, um, uh, the court said we could not bring in, um, based on four of three balancing. Right. I meant at trial, there was some testimony from the co-operator about the murder. It was. So was there any objection to that testimony at trial? Only in so far as in referencing the murder that he would mention that any of the equipment he received was from the defendant. But none of that came in. No, of course not. So the, the, the co-operator discussed the fact that he had killed this man, but it was just, he, he described his role in it. Nobody else's. Um, there was mentioned that they had police badges. I mean, they had police badges, they had police vests, they had police radios. Um, there was some testimony that their police gear looked shoddy. Like it was not very professional looking, but it was not limited to just a badge. Um, uh, and finally there was, uh, also a reference that there was no four or four B that, that shared the MO of the, the counter conviction. Now in the counter conviction, uh, the, the robbers had initially intended to burglarize this house. They, uh, realized they couldn't do that. And so they dressed up as cable men, use a defendant to create a cable ruse. Now one of the four or four B counts was a, um, what we refer to as the stash house robbery, which was a robbery in late 2008, early 2009 when I'm the defendant, the two co-operators and a few other individuals endeavored to rob some drug dealers using a cable ruse as well. Um, these guys had their cable gear. They wanted to use the cable gear to get into this, this, uh, stash house and then would rob them from the inside. Um, the testimony was that they, they looked at the area. It just looked too dangerous. And, um, and so they backed off. Um, one final issue I'd like to address is the harmless error analysis, which we address in our papers. Now, um, although the, the government did talk about several robberies that the defendant was involved in, um, uh, the government argued, and I would say this is, this is true, that there was a no robbery that was as inflammatory as the count of conviction and the count of conviction, the defendants and the two co-operators, um, held a young mother at gunpoint. Um, the mother had a seven-year-old and a one-year-old with her at the time. The seven-year-old was so frightened she urinated herself. Um, that particular robbery I'd say was the most inflammatory and the most egregious of the, of the cases that we talked about. The prior robberies, um, uh, I believe were of a similar nature, but frankly, just not quite that bad. And I know the second circuit, um, has said that, um, in weighing the, the, the probative value and the potential prejudice in these issues, um, that does matter. Uh, finally, I would just note that, um, there was an acquittal on part of this case. Um, the acquittal was one of the robberies that the, uh, the co-operators also talked about. It seems, uh, although we do not know what the jury was actually thinking, it does appear that they listened to the co-operators, they listened to the 404B, they listened to the direct testimony and exercised some judgment on which, which, um, crimes they, um, thought were worthy of evidence did not have some sort of, um, effect of just convincing the jury to abandon their analysis of the evidence. Now, uh, I bet that while you were waiting for that verdict to come in, if you were going to bet that you were going to acquit him of one of them, it wasn't going to be the one they did. Your Honor, there, uh, that, that is true. Um, I will say, like, I, the, the government has always taken the position that the evidence in the first one was stronger. Um, in addition to it being his phone, You had an ID, you had a phone? We had two IDs, Your Honor. We had a phone. We had, um, some fairly elaborate phone charts. Uh, we, we worked very hard to prove that the, um, the, the, the use of the phone right before the robbery was, uh, consistent with only the defendant. I called individuals who, um, were the last individual to talk on that phone just to prove that she didn't know who the co-operators were. Um, however, there was some very strong evidence in the counterconviction. I think the, the appellant has, um, undersold that. Um, the one very good piece of evidence which he didn't reference is, um, the young woman who was, who was robbed, um, just before, um, uh, after she called her, uh, her cable appointment and she was waiting for Time Warner, she got a call from a block number. The block number said, would you like an earlier cable appointment? And she jumped at that. We traced that block number to an Orkin Pest Control. At the Orkin Pest Control, one of the defendant's, uh, best friends worked there. Um, we showed that just before and after that call from the block number, uh, Mr. Quashie had called this woman just before and just after to arrange her to do this. Um, that in addition to the fact that, um, uh, although that, uh, the appellant is correct that the, the eyewitness did identify the, um, the tall African American robber as having, uh, braids. She did say he was very thin, tall, between 6'2 and 6'4, which matches the defendant's. Uh, and there was, you know, obviously other evidence as well. But yes, Your Honor, I did believe that, um, we would get a conviction on both and certainly the first. Now, if Your Honors don't have any other questions, I'll, um, withdraw the rest of my time. Thank you. Thank you. We'll hear the rebuttal. Your Honor, there, again, there was no testimony in these, uh, what was said on these phone conversations. We have a group of people who use phones, who share these phones, and all we have is a trend, is phone messages going from one, uh, phone to another. The government did not call the woman from Orkin. I don't know why they want, maybe they, but they wanted the evidence to come in to speculate, so the jury could speculate that must have been Mr. Quashie. Just hitting on a couple of the government's points, Mr. Quashie, the fact that Mr. Quashie didn't know the phone number, uh, is not that unusual considering that was a business phone. Uh, it was one that his business, uh, his employer used to communicate with him and for him to communicate with that. He had a second phone, which was his personal phone. That was not the phone that was dropped at the, uh, at the Parvis Street apartment. It was the phone that the government's co-operator had taken from Mr. Quashie. There's no evidence that Mr. Quashie was ever present. There's no DNA. The fact that DNA on a phone he used doesn't prove anything. He admitted he used that phone. His DNA, of course, would be there, but there was none of his DNA in the apartment. There was none of his DNA in the . . . Is it likely that he would lend his business phone? Yes, Your Honor. There's no . . . Mr. Paccio testified that he would use that phone. Mr. Paccio used it to . . . so he could call people and his wife wouldn't be able to look at his own phone to see where he had been. Mr. Paccio was a player. One of the important things in this case, Your Honor, is that Mr. Quashie was not . . . he had none of the profits. He had none of the indications that he was participating in this ongoing criminal ring. He lived in an apartment in the basement of his mother's house in Queens. He worked at various cable places and other businesses, and he maintained those jobs up to the time he went to jail in this case. He was never viewed as a danger to the community. He stayed out on bail until he surrendered in this case. This is a man whose conviction is based upon the testimony of Mr. Paccio and the litany of crimes which only Mr. Paccio claimed he participated in. The involvement of Mr. Uccoli in terms of that we outlined in our brief was extremely limited. The reliability or believability of the evidence is not a factor under 404B, correct? I mean, the fact that the testimony came from Paccio doesn't really matter ultimately. Well, you have to weigh the probative . . . Your Honor knows. You have to weigh the probative value against the risk of unfair prejudice. If the probative value is the testimony . . . The probative value of the evidence. Of the evidence. The evidence is testimony that he participated with the cooperating witness in other robberies. That's certainly probative. It's probative, but you have to consider the weight of it. If the underlying testimony is that of a cooperator whose testimony is inherently suspect, and I would argue has less weight, and therefore in the balancing would have less weight on the probative side. Thank you, Your Honor. Thank you. Well, was there a decision . . .